GRINNELL FIRE PROTECTION SYSTEMS CO., INC., Plaintiff-Appellant,

v.

W. C. EALY & ASSOCIATES, INC., Defendant-Appellant.

Court of Appeals of Tennessee, Middle Section, Nashville.

Original Filed Feb. 25, 1977.

Certiorari Denied by Supreme Court June 6, 1977.

Abridged for Publication July 5, 1977.

Jerry W. Wallace, Wade, Forrester, Hays & Wallace, Pulaski, for plaintiff-appellant.

Jack B. Henry, Henry & Henry, Pulaski, for defendant-appellant.

## OPINION

### ABRIDGED FOR PUBLICATION

TODD, Judge.

The plaintiff, Grinnell Fire Protection Systems Co., Inc., sued defendant, W. C. Ealy & Associates, Inc., for balance due for performance of a construction subcontract. The defendant filed a cross action for breach of said contract. The Chancellor allowed the amount sued for by plaintiff and sustained part, but not all, of defendant's cross action. Both parties have appealed.

This case arises out of the construction of a manufacturing plant in Lewisburg, Tennessee for the owner, Koh-i-noor Radiograph, Inc.

On August 9, 1973, said owner contracted in writing with defendant to furnish all labor and materials for construction of a building according to plans and specifications attached to the contract.

On October 11, 1973, plaintiff wrote to defendant the following letter:

"Gentlemen:

We are pleased to confirm our verbal quotation in the amount of Thirty-Four Thousand Nineteen and 00/100 Dollars ($34,019.00), for the necessary labor and material to provide automatic wet pipe sprinkler protection throughout the proposed 180′ × 350′ manufacturing building and 40′ × 80′ office area at the subject location.

We propose to start at the valve pit approximately 80′–0″ from the northwest corner of the building, provide underground supply piping on the north, east and west side of the building supplying hydrants on the southeast and southwest corners and one hydrant on the north side at the approximate center of the building and two riser supply entrance points at the north wall, including excavating and backfilling. We further propose to furnish the control valves, alarm valves, six (6) small hose stations, necessary Duraspeed brass finish pendent and upright sprinklers, including additional sprinkler protection for the concealed space of the Cosmotology Area, Rooms 27–33, pipe, fittings and hangers.

We do not include connection to the existing city water main, piping from the city main to within 80′–0″ of the northwest corner of the building, construction of the valve pit complete, rock excavation, painting or electrical wiring.

Our terms of payment are in the sum of ninety percent (90%) of the price of materials delivered and work performed in the month immediately preceding and the balance within thirty days after completion.

Thank you for the opportunity to quote. We will proceed with the installation upon receipt of two (2) signed copies of our proposal, your purchase order or contract.

Very truly yours,"

Thereafter, on November 7, 1973, plaintiff contracted in writing to furnish all labor and materials for construction of a sprinkler system in said building for the price of $34,019.00. Said contract contained the following material provisions:

"2. The Subcontractor shall furnish all labor, materials, equipment, fees, licenses, permits, etc., and shall per-

form all the Work for: Sprinkler System in accordance with the requirements of Factory Mutual Insurance Company. Furnish all labor, material, engineering and drawings, also extra requirements of Double Sprinkler Systems over Cosmotology Area. Rock Excavation shall be extra to the contract. Furnish proper Certification of Acceptance from Factory Mutual Insurance Company.

"3. The Subcontractor shall promptly submit shop drawings and samples as required in order to perform Work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other Subcontractors. The Subcontractor agrees to begin installation of the Work within five (5) days after receiving notice, either written or oral, from the Contractor. Should the Subcontractor, at any time, fail, refuse or neglect to supply sufficient material, tools, labor or properly skilled workmen to complete the Work without delaying job progress, for five (5) days after written notice of such default to Subcontractor, Contractor may at any time thereafter take over and complete the Work. The cost to Contractor of completing such work shall be deducted from any moneys due Subcontractor; if such costs exceeds any such moneys, Subcontractor shall reimburse Contractor."

Plaintiff completed the installation of the sprinkler system which was approved by a representative of Factory Mutual Insurance Company, and plaintiff received partial payment reducing the amount due for performance of the contract to $16,229.48.

Sometime after the execution of the contract and before performance of same, it was discovered that the water pressure of the available water supply was inadequate for proper performance of the sprinkler system and that a "booster pump" was required to supply the desired pressure.

Plaintiff notified defendant of the situation and offered to install the necessary booster pump (without a pump house or shelter) for $15,275.00. Defendant insisted, and now insists, that it was the duty of plaintiff to supply and install the "booster pump" without additional charge. Plaintiff denied any such obligation and declined to provide the booster pump without additional compensation.

Finally, the desired pump and necessary pump house was provided by defendant. As a result of delay in final completion of the project, defendant was penalized the contract penalty of $1,000.00 per week for 20 weeks.

The original suit of plaintiff was for the $16,229.48 due for its performance of the contract. This amount is admitted to be correct and was allowed by the Chancellor.

The countersuit of defendant was for the cost of pump installation and $20,000.00 penalty suffered for delay.

The Chancellor allowed plaintiff's claim of $16,229.48, but also allowed the counterclaim of defendant to the extent of $30,061.25 for pump and pump house, resulting in a net judgment in favor of defendant and against plaintiff in the amount of $13,831.77.

The plaintiff has filed seven assignments of error, the determinative essence of which is that plaintiff had no duty to install the pump.

It is not denied that this was a "design and build" contract, wherein the general contractor was given only general or "skeleton" specifications of the construction, and the general contractor was required to provide specific design details for attainment of a suitable result. Plaintiff admits responsibility for design and construction of a sprinkler system, but denies responsibility for design or construction of a water supply system.

Thus, the issue is whether the contract of plaintiff with defendant, requiring plaintiff to design and furnish a sprinkler system, either expressly or otherwise included the duty to investigate the nature of the water

supply in terms of quantity, rate of flow and pressure, and to include in the design of the sprinkler system the necessary equipment (pump) to produce the necessary supply, flow and pressure.

The term "Sprinkler Systems," as used in said contract, does not connote a duty to design and install the equipment necessary for producing the quantity, rate of flow and pressure of water required for the sprinkler system.

There is no evidence that the term, "Sprinkler Systems" has such a recognized meaning in the trade so as to bind plaintiff accordingly. The architect undertook to support the insistence of defendant, but his testimony is of no value because of his lack of qualification and failure to state any established practice in the trade. The architect admitted that he was not an engineer. The engineering supervision of the sprinkler installation was left to the fire prevention engineer of Factory Mutual Insurance Company who disclaimed any knowledge of whose duty it was to design and furnish the pump.

Where words in a contract are of uncertain meaning, prior negotiations between the parties are competent evidence to shed light upon the intended meaning of the words in the contract. *Turner v. Zager,* 50 Tenn.App. 674, 363 S.W.2d 512 (1962). Plaintiff's letter of October 11, 1973, expressly limits the area of intended responsibility and specifies the particular equipment to be included in the "Sprinkler Systems." There is no contradiction of this most persuasive evidence.

On May 13, 1974, a report of satisfactory completion of the sprinkler systems was signed by representatives of the defendant and the owner. At this time, the installation had been approved by the representative of the Factory Mutual Insurance Company. The fact that the sprinkler installation was approved as a unit without the pump is evidence of the intention of the parties that the sprinkler systems were separate from the supply system.

The "Loss Prevention Report" rendered to the owner by Factory Mutual on September 17, 1974 stated:

"The Grinnell Sprinkler Company of Nashville, Tennessee has satisfactorily installed automatic sprinkler protection inside the building and underground yard mains. The automatic sprinkler installation is hydraulically designed in all areas of the plant. . . . ."

Defendant places heavy reliance upon various factual conclusions of the Chancellor, but such conclusions can have no weight except as supported by evidence.

There is no substantive evidence to show a contractual duty on the part of plaintiff to investigate water supply and to design and furnish necessary pumping equipment (and housing therefor) as a part of his contract.

In the absence of any such evidence, common reason requires an interpretation of the contract which treats water supply problems as an entirely separate feature of the project from sprinkler systems.

In the view of this Court, the contract of plaintiff was to furnish and install a system of pipes, valves, fittings and accessories sufficient to adequately and satisfactorily convey and dispense water throughout the building for extinguishment of fires. Plaintiff did not contract to furnish the water supply to fill the pipes with water. If there had been no water available, plaintiff was not obligated to dig wells, build reservoirs or lay a pipeline to the nearest water source. The water supply pressure is a characteristic of the supply of water and not a part of a sprinkler system.

By analogy, the designer and installer of the electric light and power system would not be expected to guarantee an adequate supply of electricity to power the system and, if necessary, to provide at his expense a generating plant to furnish power or to supplement available power. By the same token, the installer of a heating system would not be responsible for providing an adequate supply of coal, gas or oil.

The present controversy arises from the effort of the owner to save money by requiring each subcontractor to furnish the

necessary engineering and design for his part of the work. Ordinarily, the architectural firm or a separate engineering firm assumes full responsibility for the engineering and design of the entire project, in which event there is no chance of overlooked details. However, where the engineering and design responsibility is split among many subcontractors, there is a strong probability that engineering details will be overlooked because they are not included in any subcontract.

Such is the situation in the present case. The responsibility of investigating quantity, flow and pressure of the available water supply would have been assumed and discharged by the engineer in overall charge of design. However, there was no such engineer, and the responsibility was not placed upon any subcontractor. It is true that the Factory Mutual Insurance Company was assigned some engineering responsibility, but its duties were to approve the finished product rather than to design facilities or to assign duties of designing facilities as would have been done by a general supervising engineer.

Thus, the problem which did arise was inherent in the nature of the method adopted for design and construction. The omission to anticipate the need for a pump is attributable to no one in particular, but to the method of planning which afforded the opportunity for an omission in assignment of responsibility.

The owner would suffer no real loss in being required to pay for the pump, for it was necessary from the beginning and was a necessary and proper expense of completing the project.

If the general contractor should be required to provide the pump without reimbursement, the owner would thereby acquire a valuable asset without paying for it. However, if the undertaking of the general contractor was to complete the entire project for a fixed price, his price undoubtedly included some provision for such unforeseen expenses and losses.

If the plaintiff is to be required to furnish the pump (and pump house) as ruled by the Chancellor, the owner will thereby acquire a valuable addition to its property costing over $30,000.00 without paying anything for it. As a result, plaintiff will be required to sustain a $30,000.00 loss on a $34,000.00 contract.

The equities are with plaintiff who agreed to complete specific construction for a specific price. This has been done, and the price should be paid. The defendant seeks to force the plaintiff to pay for construction which plaintiff did not agree to perform and did not include in its price. To hold with the defendant would unjustly enrich the owner to the extent of the pump construction for which the owner would pay nothing.

In spite of the provisions of § 27–303, T.C.A., this Court is unable to presume the correctness of the Chancellor's decree as to the cross action of defendant because it is contrary to the applicable law of contracts, there is no evidence to support same, and the evidence preponderates against the portion of the decree which allows any part of the counter-claim.

The foregoing renders unnecessary any discussion of complaints as to the amount of the judgment upon the counter-claim of defendant.

The decree of the Chancellor is modified to delete therefrom the judgment in favor of defendant and to substitute therefor a judgment in favor of plaintiff for $16,-229.48. As modified, the decree is affirmed, and judgment will be entered in this Court in favor of plaintiff and against defendant for $16,229.48 and all costs, including costs of this appeal.

Modified and Affirmed.

SHRIVER, P. J., and DROWOTA, J., concur.