IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2018 Session

## VININGS BANK v. HOMELAND COMMUNITY BANK ET AL.

Appeal from the Circuit Court for White County
No. CC2513  Jonathan L. Young, Judge

_____

### No. M2016-02403-COA-R3-CV

_____

The key issue on appeal is the scope of a dragnet clause under Georgia law.  Mortgagors refinanced debt secured by their real property with a new lender.  Although the new lender sent the original mortgagee the requested payoff amount, the original mortgagee refused to release its deed of trust.  The original mortgagee claimed that the real property was also security for other debts by virtue of an unrecorded instrument signed by one of the mortgagors that contained a dragnet clause.  The mortgagee sought a declaratory judgment that its unrecorded instrument had priority over the deed of trust recorded by the new lender.  The new lender counterclaimed, seeking the statutory penalty for the mortgagee's failure to release its deed of trust and recovery of attorney's fees and expenses.  The trial court concluded that the unrecorded instrument was unenforceable and not effective as to the new lender due to a lack of actual notice.  The court also ordered the original mortgagee to release its deed of trust and awarded the new lender the statutory penalty and attorney's fees.  On appeal by the original mortgagee, we conclude that the unrecorded instrument was enforceable, but under Georgia law, the dragnet clause was limited to the debts of the mortgagor who signed the instrument.  Because of the lack of actual notice, the unrecorded instrument was not effective as to the new lender.  Despite the new lender being a defendant in the declaratory judgment action, the new lender's counterclaim for the statutory penalty entitled it to an award of attorney's fees.  We affirm the decision of the trial court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Stephen C. Knight and Nader Baydoun, Brentwood, Tennessee, for the appellant, Vinings Bank.

William J. Butler, McMinnville, Tennessee, for the appellee, Homeland Community Bank.

Donald Capparella and Candi Henry, Nashville, Tennessee, for the appellees, Forrest Clark Cantrell, Jr. and Mark R. Cantrell.

**OPINION**

**I.**

**A.**

Although the property at the center of the present dispute is located in White County, Tennessee, some of the parties call Georgia home, and the events leading up to this appeal began there.[1]  In 2006, Georgia residents, Dr. Clark Cantrell, a pediatrician, and his wife, refinanced debt on their home (the "Georgia Property").  They obtained a loan for $177,070.50 from Unity National Bank (the "Georgia Loan").  To secure their obligation, Dr. and Mrs. Cantrell signed a "deed to secure debt" in favor of Unity for the Georgia Property.[2]  Unity's interest was junior to an interest already held in the Georgia Property by Wells Fargo Bank.  The following year, Unity assigned the Georgia Loan along with the security deed to Vinings Bank, a Georgia state-chartered bank.

In 2008, Dr. Cantrell sought to consolidate his personal debts by obtaining a loan directly from Vinings Bank for $85,977.25 (the "Tennessee Loan").  Dr. and Mrs. Cantrell signed a promissory note for that amount, which provided that the Tennessee Loan would be secured by "real property known as 518 Cedar Lane Sparta, TN 38583" (the "Sparta Property").  Dr. Cantrell jointly owned the Sparta Property with his brother, Mark Cantrell, so when it came time to sign a deed of trust for the Sparta Property, Dr. Cantrell and Mark Cantrell signed along with their wives (the "Vinings Deed of Trust").

---

[1] The parties do not dispute the trial court's factual findings.  So we have drawn much of the factual background from the trial court's findings of fact.

[2] A deed to secure debt, also known as a security deed, is "unique to the State of Georgia." 3 GA. JUR. *Property* § 23:1, Westlaw (database updated May 2019).  It "conveys legal title solely for the purpose of securing a debt." *Id.*; *see Shumate v. McLendon*, 48 S.E. 10, 11 (Ga. 1904).  The grantor retains an equitable estate consisting of a right to possession and a right of redemption.  3 GA. JUR. *Property* § 23:1.  Once the debt is paid in full, legal title passes back to the grantor.  *Nw. Carpets, Inc. v. First Nat'l Bank of Chatsworth*, 630 S.E.2d 407, 409 (Ga. 2006); Ga. Code Ann. § 44-14-60 (West, Westlaw current through laws effective as of June 1, 2019).

The Vinings Deed of Trust specifically provided that it secured repayment of the Tennessee Loan, including any renewals, extensions, or modifications of the Tennessee Loan, and the performance of any "covenants and agreements" under the Vinings Deed of Trust or the Tennessee Loan. The Vinings Deed of Trust made no mention of the Georgia Loan. The Vinings Deed of Trust was also quite specific about its release:

> Upon payment of all sums secured by [the Vinings Deed of Trust], Lender shall release [the Vinings Deed of Trust]. Lender may charge Borrower a fee for releasing [the Vinings Deed of Trust], but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

In addition to the Vinings Deed of Trust and central to this appeal, Vinings Bank also required Mark Cantrell to separately sign an "Owner's Consent to Pledge of Collateral" (the "Owner's Consent"). The Owner's Consent referenced other indebtedness of Dr. and Mrs. Cantrell beyond the Tennessee Loan and included an acknowledgment that the Sparta Property would also secure the other indebtedness. In pertinent part, the Owner's Consent provided as follows:

> Undersigned agrees that [the Sparta Property] shall secure, and that a security interest in [the Sparta Property] shall exist and will continue to exist in Lender's favor as security for any and all indebtedness, obligations or liabilities of every kind and nature of [Dr. and Mrs. Cantrell,] or of the undersigned, to Lender, howsoever evidenced, whether now existing or hereafter arising, either direct or indirect, joint or several, as maker, endorser, guarantor, surety or otherwise and any and all extensions or renewals thereof, including reasonable attorney's fees if any of said debt is collected by or through an attorney at law.

Despite the language of the Owner's Consent, Dr. and Mrs. Cantrell never agreed that the Sparta Property would secure all their debts to Vinings Bank. A clause, such as the one quoted from the Owner's Consent, that "purports to include within the coverage of the deed of trust all present and future indebtedness owed by the borrower to the lender in addition to the specific debt being secured by the deed of trust" is known as a "dragnet clause." *In re Lemka*, 201 B.R. 765, 767 n.2 (Bankr. E.D. Tenn. 1996), *cited in Home Fed. Bank, FSB v. First Nat'l Bank*, 110 S.W.3d 433, 436 (Tenn. Ct. App. 2002). Vinings Bank later claimed that, "[d]ue to a drafting error," the Vinings Deed of Trust did not include a dragnet clause or language similar to that of the Owner's Consent.

Vinings Bank recorded the Vinings Deed of Trust in White County, Tennessee. But it never recorded the Owner's Consent. While Vinings Bank did later record a modification to the Vinings Deed of Trust, the modification did not add a dragnet clause. The modification reflected a change in the maturity date of the Tennessee Loan.

3

Otherwise, "[a]ll other terms and conditions of the [Vinings] Deed of Trust . . . remain[ed] in full force and effect."

B.

In 2010, Dr. Cantrell lost his job. And Wells Fargo Bank began foreclosure proceedings on the Georgia Property. Seeking to avoid a foreclosure on his residence, Dr. Cantrell contacted both Wells Fargo and Vinings Bank about consenting to a private sale of the Georgia Property for less than the total outstanding debt. The parties characterized this as a "short sale."[3]

On July 1, 2010, Mark Adams, an assistant vice president with Vinings Bank, emailed Dr. Cantrell with the conditions under which Vinings Bank would cancel its deed to secure debt of the Georgia Property. The email also addressed Vinings Bank's expectations concerning the outstanding debt, including the Tennessee Loan:

> Instead of writing a narrative, let me just hit the high points like this. Please call me if something does not make sense. . . .
>
> - Please confirm/verify that the foreclosure has been postponed as early tomorrow as possible – Monday is a holiday and will be too late.
> - Clark Hungerford[, chief credit officer of Vinings Bank,] would like to schedule a meeting as soon as possible with you at the bank to discuss everything.
> - We will draft an agreement for you to sign concerning the short sale issues. This agreement will state in a nutshell that after you sign, we will release our lien on the deed to your house but not the debt. Any outstanding balance will be considered an unsecured loan to you. It will also state that as long as you continue to make payments as scheduled on both loans, [Vinings Bank] will not exercise any rights against the [Sparta Property]. Furthermore, [Vinings Bank] will not release the deed on the [Sparta Property] until all debts you have with the bank have been retired.
> - If Wells Fargo allows Vinings Bank to have some of the proceeds from the short sale, [Vinings Bank] will reduce your balance with [Vinings Bank] by the same amount.

---

[3] Traditionally, a "short sale" is a sale of borrowed securities. *Short Sale*, BLACK'S LAW DICTIONARY (10th ed. 2014). In this context, "[a] short sale is a real estate transaction in which the property serving as collateral for a mortgage is sold for less than the outstanding balance on the secured loan." *Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 752 (9th Cir. 2018). In some instances, due to the consumer's financial difficulties, the mortgage lender will also agree not to collect from the consumer the balance of the loan not satisfied from the proceeds of the short sale. *Id.* But, as this case illustrates, sometimes the mortgage lender looks to the consumer to pay any outstanding balance.

4

I'm sure there is more, but those are the most important things for you to think about.

Although Mr. Adams's assertion that Vinings Bank would not release the Vinings Deed of Trust on the Sparta Property "until all debts" owed by Dr. Cantrell were "retired" conflicted with the terms of the Vinings Deed of Trust, Dr. Cantrell did not challenge the assertion.

During this time, Vinings Bank apparently also intimated to Dr. Cantrell that it might have to foreclose on the Sparta Property. While Dr. Cantrell and Mark Cantrell co-owned the Sparta Property, they acquired it from their parents, who still lived on the property. Anxious to spare their parents the possibility of being evicted from their home following a foreclosure, the brothers decided to pay the Tennessee Loan through a refinancing.

On July 22, 2010, Dr. Cantrell emailed Mr. Adams at Vinings Bank to request that wiring instructions and the payoff amount for the Tennessee Loan be sent to his brother, Mark. Mr. Adams responded indicating that it would be the following day before he could get the payoff information. Additionally, he added the following caveat regarding the release of the Vinings Deed of Trust:

> Please let [Mark Cantrell] know that we will accept the payoff but will not release the lien on your folks' house[, the Sparta Property,] at least until after you talk with [Mr. Hungerford]—or possibly until after the dust settles from the . . . short sale [from the Georgia Property], or all of your debts here are retired. I just have no way of knowing that answer at this time.

The next day, as requested, Mr. Adams sent an email to Mark Cantrell, which included the payoff and wiring instructions as attachments. In the body of the email, Mr. Adams included an almost identical caveat regarding the release of the Vinings Deed of Trust. Although Mark Cantrell later acknowledged receiving the attachments, he claimed that he did not read the body of Mr. Adams's email.

On July 26, 2010, Dr. Cantrell and Mark Cantrell borrowed the funds to pay the Tennessee Loan from Homeland Community Bank in McMinnville, Tennessee (the "Homeland Loan"). They also executed a deed of trust in favor of Homeland (the "Homeland Deed of Trust") for the Sparta Property, which was recorded in White County, to secure the Homeland Loan.

Homeland made the Homeland Loan anticipating that, after making the payoff to Vinings Bank, it would have a first priority interest in the Sparta Property. A title search ordered by Homeland and obtained prior to the closing of the Homeland Loan revealed

the Vinings Deed of Trust—which, again, only indicated that the Sparta Property would serve as security for the Tennessee Loan—as the only significant cloud on the Sparta Property's title. Likewise, despite Mr. Adams's cautions, Dr. Cantrell and Mark Cantrell also expected that the Vinings Deed of Trust would be released. Dr. Cantrell later testified that, had he known that the Sparta Property would be security for all his obligations to Vinings Bank, he "wouldn't have made that loan with Vinings."

The same day as the Homeland Loan, Homeland wired the payoff to Vinings Bank. Although it is undisputed that the amount wired satisfied the Tennessee Loan, Vinings Bank did not release the Vinings Deed of Trust. Surprisingly, after the closing of the Homeland Loan, no one checked the register's office in White County to verify their expectations that the Vinings Deed of Trust would be released.

In late 2011, after several failed attempts, Dr. and Mrs. Cantrell finally sold the Georgia Property. Vinings Bank received only $6,000 from the sale, which left over $160,000 owing on the Georgia Loan. Still, to facilitate the sale, Vinings Bank canceled its deed to secure debt on the Georgia Property.

Sometime in 2013, Dr. Cantrell had a meeting with Mr. Hungerford about his outstanding debt to Vinings Bank. And "that's when the conversation again came up about putting Mom[4] out of the house, which [Dr. Cantrell] thought had been rectified." Dr. Cantrell hired an attorney, and on July 10, 2013, his attorney sent an email to Mr. Hungerford concerning the outstanding debt on the Georgia Loan. It requested "that Vinings Bank cease from threatening to foreclose on the property where [Dr. Cantrell's] mother resides in Tennessee[, the Sparta Property]." The email also insisted that Mr. Hungerford release the Vinings Deed of Trust and advised that Vinings Bank had an obligation to do so under both Tennessee and Georgia law.

On October 21, 2013, counsel for Mark Cantrell, on behalf of his client and Homeland, sent a letter to counsel for Vinings Bank again requesting release of the Vinings Deed of Trust. The letter also referenced the possibility of statutory penalties for the failure to release the Vinings Deed of Trust. The final demand letter came on December 6, 2013. Counsel for Homeland's letter requested that Vinings Bank release the Vinings Deed of Trust "within the next five (5) working days."

C.

Vinings Bank did not even allow five calendar days to pass before filing a declaratory judgment action in the Circuit Court for White County, Tennessee. Vinings Bank named as defendants Homeland, the Cantrell brothers, and their wives. The action

---

[4] At some point, their father passed away.

6

sought a declaration from the court that the Vinings Deed of Trust secured the Georgia Loan and took priority over the Homeland Deed of Trust as to the Sparta Property.

The action also sought relief specific to Dr. Cantrell and Mark Cantrell. Vinings Bank initially requested damages for fraudulent misrepresentation and an award of attorney's fees under the loan documentation and Georgia statute. Later, through an amended pleading, Vinings Bank added a claim for breach of an Errors and Omissions Agreement that Dr. Cantrell and Mark Cantrell had executed in connection with the closing of the Tennessee Loan.[5] The Errors and Omissions Agreement obligated the Cantrell brothers to cooperate and adjust for "clerical errors" in any loan documents as necessary to enable Vinings Bank "to sell, convey, seek guaranty or market" the Tennessee Loan. Vinings Bank claimed that the Errors and Omissions Agreement required the Cantrell brothers to cooperate with the "correction" of the Vinings Deed of Trust and to consent to the addition of a dragnet clause to the document.

Homeland answered and asserted counterclaims against Vinings Bank and cross-claims against Dr. Cantrell and Mark Cantrell. Homeland sought a declaratory judgment that the Homeland Deed of Trust had priority over the Vinings Deed of Trust. And it requested that a statutory penalty be awarded as a result of Vinings Bank's failure to release the Vinings Deed of Trust and recovery of attorney's fees and costs. *See* Tenn. Code Ann. § 66-25-102(b) (2015). If the court determined that Vinings Bank had priority over the Homeland Deed of Trust, Homeland alleged that the Cantrell brothers were liable under theories of intentional misrepresentation and breach of contract. According to Homeland, the Cantrell brothers had misrepresented the amount required to cause a release of the Vinings Deed of Trust and the existence of a superior lien breached the warranty of title contained in the promissory note they signed as part of the Homeland Loan.

The Cantrell brothers' answers denied knowledge that the Vinings Deed of Trust secured any debt other than the debt expressly referred to in the Vinings Deed of Trust— the Tennessee Loan. Additionally, Mark Cantrell and his spouse, Connie Cantrell, asserted defenses to the enforcement of the Owner's Consent.

Following a one-day bench trial, the court issued its order, which included extensive findings of fact and conclusions of law. On the competing requests of Vinings Bank and Homeland for declaratory relief, the court determined that Vinings Bank was not entitled to its requested declaratory judgment. Because the Owner's Consent was not recorded, the court concluded that it was "null and void" as to Homeland as a subsequent

---

[5] The record on appeal does not include an order from the trial court authorizing the amended pleading. The trial court did consider claims alleged in Vinings Bank's "First Amendment to Complaint," but no party has raised the consideration of such claims as an issue on appeal.

creditor. The court found that Homeland did not have "actual notice" of the Owner's Consent prior to the recording of the Homeland Deed of Trust. It also concluded that Vinings Bank was obligated to release the Vinings Deed of Trust under both its terms and by Tennessee statute. So the court granted Homeland a declaratory judgment that the Homeland Deed of Trust was "the only valid security interest on the Sparta Property as of the date of the payoff." And it ordered Vinings Bank to immediately release the Vinings Deed of Trust. It further awarded Homeland a statutory penalty as a result of Vinings Bank's failure to timely release the Vinings Deed of Trust and determined that Homeland was entitled to an award of its reasonable expenses, including attorney's fees and costs, incurred in seeking the release of the Vinings Deed of Trust.[6]

The court next considered whether the Owner's Consent was valid and binding against Mark Cantrell. The court concluded that it was not for various reasons. It determined that the Owner's Consent was unconscionable and violated both Georgia's "Open-End" Clauses Statute, *see* Ga. Code Ann. § 44-14-1(b) (West, Westlaw current through laws effective as of June 1, 2019), and Georgia's Statute of Frauds, *see* Ga. Code Ann. § 13-5-30 (West, Westlaw current through laws effective as of June 1, 2019). Even if the Owner's Consent was valid and binding, the court held that Vinings Bank waived enforcement of the agreement by having the Cantrell brothers sign the Vinings Deed of Trust. It described the dragnet clause in the Owner's Consent and the language in the Vinings Deed of Trust, stating that the Sparta Property was security for the Tennessee Loan, as "contradictory terminology." And when providing the payoff, Vinings Bank only provided the balance of the Tennessee Loan rather than the outstanding balance of all debt owed by Dr. and Mrs. Cantrell. Based on the same facts, the court also determined that Vinings Bank was equitably estopped from enforcing the Owner's Consent.

The trial court dismissed Vinings Bank's claims and Homeland's cross-claims against the Cantrell brothers based on misrepresentation. It explained that neither bank presented evidence of false representations concerning a material fact. The court further noted that, even if false representations had been made, Vinings Bank could not demonstrate reliance. Moreover, because Vinings Bank's claim of priority failed, the court reasoned that Homeland could not demonstrate injury from any misrepresentation by the Cantrell brothers.

Finally, the court concluded that the Errors and Omissions Agreement did not afford Vinings Bank relief. The court described the omission of the dragnet clause in the Vinings Deed of Trust as something more than a "clerical error." Neither of the Cantrell brothers intended for the Vinings Deed of Trust to include a dragnet clause.

---

[6] In a separate order, the trial court ordered Vinings Bank to pay Homeland the total sum of $96,839.57 for its reasonable attorney's fees and expenses and court costs.

**II.**

On appeal, Vinings Bank raises three issues for our review. First, we consider whether the trial court erred in determining that the Owner's Consent was invalid and unenforceable. Second, we consider whether Homeland had actual notice of the Owner's Consent such that it was effective as to Homeland. Finally, we consider whether the trial court erred in awarding Homeland its attorney's fees, expenses, and court costs under Tennessee Code Annotated § 66-25-102. As part of the final issue, we address Homeland's request for attorney's fees, expenses, and costs incurred on appeal.

Because judgment was entered following a bench trial, in reviewing the issues raised, we presume that the trial court's findings of fact are correct unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). Here, our review is limited to the trial court's conclusions of law because Vinings Bank "does not contest the trial court's findings of fact." We review conclusions of law de novo, with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

**A.**

In considering whether the Owner's Consent was valid and enforceable, the trial court applied Georgia law. The Owner's Consent provided that it would "be governed and construed in accordance with the laws of the State of Georgia." And none of the parties contest the application of Georgia law. So we apply Georgia law as well.[7]

1. Unconscionability

The trial court first determined that the Owner's Consent was unconscionable. Under Georgia law, "[a]n unconscionable contract is one abhorrent to good morals and conscience . . . where one of the parties takes a fraudulent advantage of another[,] an agreement that no sane person not acting under a delusion would make and that no honest person would take advantage of." *Mallen v. Mallen*, 622 S.E.2d 812, 816-17 (Ga. 2005)

---

[7] If enforceable, the extent to which the Owner's Consent impacts the title to Tennessee realty is governed by Tennessee law. *See King v. King*, 48 S.E.2d 465, 470 (Ga. 1948) ("Law governing the title and disposition of land is exclusively subject to the laws of the State where it is situated."); *Watkins v. Watkins*, 22 S.W.2d 1, 3 (Tenn. 1929) ("[T]he methods in which a charge may be fixed upon the land . . . must be determined in conformity to the lex situs."); P.H. Vartanian, *Law Governing Validity and Construction of, and Rights and Obligations Arising under, a Lease of Real Property*, 15 A.L.R.2d 1199 (1951) ("The general principle is well settled that rights in and title to real property are governed by the law of the situs of such property.").

(quoting *William J. Cooney, P.C. v. Rowland*, 524 S.E.2d 730, 732 (Ga. Ct. App. 1999)) (alterations in original).

As already noted, by the Owner's Consent, Mark Cantrell agreed:

that [the Sparta Property] shall secure, and that a security interest in [the Sparta Property] shall exist and will continue to exist in [Vinings Bank's] favor as security for any and all indebtedness, obligations or liabilities of every kind and nature of [Dr. and Mrs. Cantrell,] or of the undersigned, to [Vinings Bank], howsoever evidenced, whether now existing or hereafter arising, either direct or indirect, joint or several, as maker, endorser, guarantor, surety or otherwise and any and all extensions or renewals thereof, . . . .

In determining the Owner's Consent was unconscionable, the court found that "no evidence was introduced that [Mark Cantrell] knew of the Georgia Loan, nor was he informed by Vinings Bank or any other party that the Sparta Property could possibly be used as collateral for the Georgia Loan or any other debt of his brother." The finding suggests that Vinings Bank took advantage of Mark Cantrell in obtaining his agreement to pledge the Sparta Property by not disclosing all of the liabilities of Dr. and Mrs. Cantrell in addition to the Tennessee Loan.

Even on the facts found by the trial court, we cannot conclude that the Owner's Consent is unconscionable. If anything, the Owner's Consent put Mark Cantrell on notice of other debt owing by Dr. and Mrs. Cantrell. And the Owner's Consent was clear in that it included "indebtedness, obligations or liabilities of" Dr. and Mrs. Cantrell that might arise after the date of the Owner's Consent. Further, "[i]t is well settled that . . . 'dragnet' clauses regarding future advances are valid and enforceable in [Georgia]." *Tedesco v. CDC Fed. Credit Union*, 306 S.E.2d 397, 399 (Ga. Ct. App. 1983).

2. Open-End Clauses Statute

The trial court next determined that the Owner's Consent violated Georgia's "Open-End" Clauses Statute.[8] As described in the statute, "open-end" clauses are dragnet clauses. *Cf. id.*; GA. REAL ESTATE FINANCE AND FORECLOSURE LAW § 2.3, Westlaw (database updated Oct. 2018). The statute limits the breadth of such clauses as follows:

(b) . . . [T]he operation of "open-end" clauses contained in real estate mortgages or deeds conveying realty as security for a debt, which clauses

---

[8] Vinings Bank does not challenge the trial court's determination that the Owner's Consent is a real estate mortgage or deed conveying realty as security for a debt within the meaning of the "Open-End" Clauses Statute.

10

provide that, in addition to securing the debt named or described in the instrument, such instruments or the property thereby conveyed shall also secure any other debt or obligation that may be or become owing by the mortgagor or grantor, is limited to other debts or obligations arising ex contractu, as distinguished from those arising ex delicto, *between the original parties to the security instrument*.

Ga. Code Ann. § 44-14-1(b) (emphasis added). The trial court concluded that the Owner's Consent violated the statute because neither Mark Cantrell nor Vinings Bank was an "original party" to the Georgia Loan, which was made by Unity National Bank to Dr. and Mrs. Cantrell and later assigned to Vinings Bank.

Vinings Bank submits that the trial court misinterpreted the statute. According to Vinings Bank, the statute is not concerned with the original parties to the underlying secured debt. Instead, section 44-14-1(b) is concerned with the original parties to "*the security instrument*." We agree, but Vinings Bank contends "*the security instrument*" refers to the Vinings Deed of Trust signed by the Cantrell brothers and their wives. Because "[t]he Georgia Loan is a debt owed by Dr. Cantrell to Vinings Bank," Vinings Bank posits that "[t]he Georgia Loan is therefore a 'debt or obligation' between the 'original parties to the security agreement[, the Vinings Deed of Trust].'"

Vinings Bank's argument misapplies the statute. Properly read, "the phrase ["original parties"] simply means that a dragnet clause in a security deed limits the operation of the security deed to debts of the parties to the security deed." *Willis v. Rabun Cty. Bank*, 291 S.E.2d 715, 717 (Ga. 1982) (interpreting an earlier version of the "Open-End" Clauses statute). Although Vinings Bank submits that the "security deed" or "the security instrument" under the facts of this case is the Vinings Deed of Trust, the Vinings Deed of Trust does not contain an open-end clause. The open-end clause is found only in the Owner's Consent, so the Owner's Consent is "the security instrument" to which the statute refers.

By virtue of the Open-End Clauses Statute then, the dragnet clause in the Owner's Consent is limited to debts of Mark Cantrell to Vinings Bank. Because the Georgia Loan was not a debt or obligation of Mark Cantrell, the dragnet clause in the Owner's Consent could not serve to mortgage or convey the Sparta Property as security for the Georgia Loan.

3. Statute of Frauds

The trial court also concluded that the Owner's Consent violated Georgia's Statute of Frauds. Georgia Code Annotated § 13-5-30, Georgia's Statute of Frauds, requires an agreement to answer for the debt of another to "be in writing and signed by the party to be charged." Ga. Code Ann. § 13-5-30(2). To satisfy the statute of frauds, the court

11

determined that the Owner's Consent had to identify the Georgia Loan, the amount due, and the time for payment.

In the case of guaranties, Georgia has interpreted the writing and signature language in the statute of frauds to mandate "identif[ication of] the debt, the principal debtor, the promisor, and the promisee." *John Deere Co. v. Haralson*, 599 S.E.2d 164, 166 (Ga. 2004) (citing *Schroeder v. Hunter Douglas, Inc.*, 324 S.E.2d 746, 747 (Ga. Ct. App. 1984); *Roach v. C.L. Wigington Enters.*, 539 S.E.2d 543, 544 (Ga. Ct. App. 2000)). As the Georgia Court of Appeals explained, such writings must "identify the debt which is the subject of the promise, indicate knowledge of both the amount promised to be paid and the time the debt becomes due." *Brzowski v. Quantum Nat'l Bank*, 717 S.E.2d 290, 292 (Ga. Ct. App. 2011) (quotation omitted).

Although the Owner's Consent does not appear to be a guaranty, Vinings Bank does not argue the Georgia Statute of Frauds is inapplicable. Instead, assuming for the sake of argument that it qualifies as a guaranty (or promise to answer for the debts of another), Vinings Bank argues that the Owner's Consent is sufficiently specific under Georgia law.

Both the Georgia Supreme Court and the Georgia Court of Appeals have found open-end clauses, such as the one here, to satisfy the statute of frauds. *See, e.g.*, *John Deere Co.*, 599 S.E.2d at 165 (identifying the debt as "past and/or future extension of credit" to the principal debtor); *Brzowski*, 717 S.E.2d at 293 (identifying the debt as "Present and Future Debt" of the principal debtor). In a case relied on by the trial court, *Tampa Investment Group, Inc. v. Branch Banking and Trust Co., Inc.*, the Georgia Supreme Court determined that guaranties identifying the applicable debts as "any and all notes and other indebtedness" owed by the borrowers to the lender "now or hereafter" sufficient under the statute of frauds. 723 S.E.2d 674, 679-80 (Ga. 2012).

The language employed in *Tampa Investment Group, Inc.* is similar to that used in the Owner's Consent. So we conclude the Owner's Consent satisfied the statute of frauds. The writing identified each of the relevant parties and identified the debt as "any and all indebtedness, obligations or liabilities of every kind and nature of [Dr. and Mrs. Cantrell,] or of the undersigned, to [Vinings Bank], howsoever evidenced, whether now existing or hereafter arising."

4. Waiver and Equitable Estoppel

Lastly, the trial court concluded that, even if the Owner's Consent was legally valid, Vinings Bank waived its right to enforce it or is equitably estopped from enforcing it. Because we conclude that the Owner's Consent, although limited, was nonetheless valid, we examine the trial court's basis for determining that waiver and equitable estoppel apply. Specifically, the court stated that Vinings Bank could not enforce the

Owner's Consent because it contained "contradictory terminology" to the Vinings Deed of Trust and Vinings Bank only gave the outstanding balance of the Tennessee Loan as the payoff amount when requested by the Cantrell brothers.

Georgia "law will not infer the waiver of an important contract right unless 'the waiver is *clear and unmistakable.*'" *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 739 S.E.2d 493, 496 (Ga. Ct. App. 2013) (quoting *Accurate Printers, Inc. v. Stark*, 671 S.E.2d 228, 232 (Ga. Ct. App. 2008)). "And because waiver is not favored under the law, the evidence relied upon to prove a waiver 'must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation.'" *Id.* (quoting *D.I. Corbette Elec., Inc. v. Venture Constr. Co.*, 231 S.E.2d 536, 538 (Ga. Ct. App. 1976)). When, as here, the facts establishing the waiver are undisputed, "waiver becomes a question of law." *Id.* (quoting *Goldsmith v. Peterson*, 703 S.E.2d 694, 697 (Ga. Ct. App. 2010)).

We conclude the undisputed facts do not establish a waiver by Vinings Bank. Although the language of the Vinings Deed of Trust and the Owner's Consent described the secured indebtedness differently, the differing language does not evidence a clear intent to forego any contract rights. Instead, as the court found from the testimony of Mr. Adams, the different language in the two documents suggests a mistake made in preparation of the Vinings Deed of Trust. Likewise, the payoff amount provided by Vinings Bank is not indicative of an intent to relinquish a right. Both immediately before and in transmitting the payoff amount, Mr. Adams advised the Cantrell bothers that Vinings Bank may not release the Vinings Deed of Trust until all of Dr. Cantrell's debts were "retired."

For much the same reasons, we conclude that Vinings Bank was not equitably estopped from enforcing the Owner's Consent. For equitable estoppel to apply, the following elements must be present:

> (1) conduct amounting to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts . . . .

*Bell v. Studdard*, 141 S.E.2d 536, 540 (Ga. 1965). Here, the first element was not present. The parties do not dispute that Vinings Bank communicated the accurate amount to pay off the Tennessee Loan. And the court found that, on at least two occasions to Dr. Cantrell and one occasion to Mark Cantrell, Mr. Adams expressed that Vinings Bank would not release the Vinings Deed of Trust upon receipt of the payoff. Something more

13

had to happen, either further discussions or payment of all outstanding debt. Both Dr. Cantrell and Mark Cantrell were informed of this but chose to proceed anyway.

B.

Although our holding limits the application of the dragnet clause in the Owner's Consent to the debts of Mark Cantrell to Vinings Bank, we still consider whether any interest in the Sparta Property created by the Owner's Consent is effective against Homeland. As the trial court noted, unregistered instruments are "null and void as to existing or subsequent creditors of . . . the makers without notice." Tenn. Code Ann. § 66-26-103 (2015).[9] "Instruments" in this context includes, among other things, "mortgages and deeds of trust" and an "agreement to . . . mortgage, pledge, . . . encumber, . . . or otherwise affect . . . real property." *Id.* § 66-24-101(a)(8), (26)(A) (Supp. 2018). While conceding that the Owner's Consent was not registered, Vinings Bank contends that Homeland had notice of the Owner's Consent. Unregistered instruments are effective between the parties to the instrument, including their heirs and representatives, and other persons "having actual notice" of the instrument, except as otherwise provided by statute. *Id.* § 66-26-101.

Vinings Bank submits that Homeland had actual notice of the Owner's Consent by virtue of its dealings with the Cantrell brothers. According to Vinings Bank, the Cantrell brothers in obtaining the necessary payoff information for the Tennessee Loan acted as agents for Homeland, and while acting as agents, the brothers were "repeatedly notified by Vinings that the [Sparta] Property was security not only for the Tennessee Loan, but also for the Georgia Loan." So Vinings Bank contends that the agents' actual knowledge of the Owner's Consent should be imputed to Homeland. *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . .").

Vinings Bank's argument fails for a number of reasons. But we focus on only two. First, the argument cannot overcome the trial court's factual finding that Homeland had no actual notice of the Owner's Consent. Vinings Bank accepts that finding. Second, as Homeland points out, Vinings Bank did not raise or argue its agency theory in the trial court. As an appellate court, "we are limited in authority to the adjudication of issues that are *presented and decided* in the trial courts." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001). A party may not raise an issue for the first time on appeal.

---

[9] Under an early nineteenth century version of the statute, unregistered instruments were null and void even against creditors with notice of the instrument. *Wright v. Black*, 17 S.W.2d 917, 918 (Tenn. 1929). Although the language of statute has changed over the years to reflect that notice affects creditors as well as bona fide purchasers, unregistered instruments may continue to be null and void against creditors with actual notice. *See Texas Co. v. Aycock*, 227 S.W.2d 41, 45 (Tenn. 1950).

*In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013); *see also Welch v. Bd. of Prof'l Responsibility*, 193 S.W.3d 457, 465 (Tenn. 2006) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal.").

Vinings Bank makes an alternative argument that was raised in the trial court. The second argument is that Homeland had *inquiry* notice of the Owner's Consent based on the Vinings Deed of Trust and the communications made by Vinings Bank in connection with providing the payoff for the Tennessee Loan. Inquiry notice "occup[ies] . . . a middle ground between constructive notice and actual notice." *Blevins v. Johnson Cty.*, 746 S.W.2d 678, 683 (Tenn. 1988). In Tennessee, inquiry notice is treated "as a variant of actual notice." *Id.*

We conclude that Vinings Bank's second argument is unavailing. Even if inquiry notice was sufficient, an issue we need not decide, Homeland did not have inquiry notice. Nothing in the Vinings Deed of Trust indicates or suggests that further inquiry by Homeland was necessary. The Vinings Deed of Trust does not reference the Owner's Consent. And the Vinings Deed of Trust specifically provided that it secured repayment of the Tennessee Loan, including any renewals, extensions, or modifications of the Tennessee Loan, and the performance of any "covenants and agreements" under the Vinings Deed of Trust or the Tennessee Loan. Vinings Bank's statements that it would not release the Vinings Deed of Trust upon receipt of the payoff for the Tennessee Loan were not made to Homeland. And the statements were not shared with Homeland. In addition, there was no proof presented that Vinings Bank ever referenced the Owner's Consent in any of its communications with the Cantrell brothers prior to the closing of the Homeland loan.

## III.

The final issue raised by Vinings Bank concerns the trial court's award of attorney's fees and expenses to Homeland. Vinings Bank contends that the award was not authorized under the statute relied on by the court, Tennessee Code Annotated § 66-25-102. Homeland requests an award of attorney's fees, expenses, and costs incurred on appeal under the same statute. So we address the final issue and the request together.

Resolving the issue and addressing the request require statutory interpretation. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 53 (2012) ("Every application of a text to particular circumstances entails interpretation."). Statutory interpretation is a question of law, which we review de novo. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003). When a statute's language is unambiguous, we look to the statute's plain language. *Carson Creek Vacation Resorts, Inc. v. Dep't of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993). The words are given their natural, ordinary meaning "in the context in which they appear in the statute and in light of the statute's general purpose." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn.

2010). But, when a statute's language is subject to several interpretations, we also consider the broader statutory scheme, the statute's general purpose, and other sources to ascertain legislative intent. *Wachovia Bank of N.C., N.A. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000).

By statute, "[w]hen a debt secured by a . . . deed of trust . . . has been fully paid or satisfied, the mortgagee . . . who has received payment or satisfaction of the debt[] must satisfy the record by a formal deed of release." Tenn. Code Ann. § 66-25-101(a) (2015). Under Tennessee Code Annotated § 66-25-102, if the mortgagee fails to enter a "proper release of record after having been fully paid," the party that made the payment may request in writing that the mortgagee enter the release. *Id.* § 66-25-102(a). If the mortgagee fails to enter the release within 45 days of its receipt of the request, the mortgagee must "forfeit" $100 to the requesting party. *Id.* If the requesting party makes a second request and the release is not entered after 30 days from the second request, the mortgagee must forfeit "a sum not to exceed" $1,000. *Id.* § 66-25-102(b). If "suit is instituted to collect either or both of the forfeitures," the mortgagee is "liable to the party instituting suit for all reasonable expenses, attorney fees, and the court costs incurred in the action." *Id.* § 66-25-102(c).

We apply the statute to underlying circumstances that are not in dispute. The amounts paid by Homeland satisfied the Tennessee Loan. By its terms, the Vinings Deed of Trust was security for the Tennessee Loan and no other indebtedness.[10] Statute required the release of the Vinings Deed of Trust when the underlying debt was paid, but so did the terms of the deed of trust. Under the Vinings Deed of Trust, Vinings Bank agreed to execute a release "[u]pon payment of all sums secured by this Security Instrument." But despite receiving the payoff and written requests from Homeland as required by Tennessee Code Annotated § 66-25-102, Vinings Bank never recorded or provided a release.

Still, Vinings Bank contends that Homeland was not entitled to recover its attorney's fees and expenses in the trial court nor is it entitled to fees and expenses on appeal. Tennessee Code Annotated § 66-25-102(c) provides that a mortgagee is "liable to *the party instituting suit* for all reasonable expenses, attorney fees, and the court costs incurred in the action." *See id.* § 66-25-102(c) (emphasis added). Thus, according to Vinings Bank, fees and expenses are only available to a party that institutes a suit by filing a complaint. *See* Tenn. R. Civ. P. 3 ("All civil actions are commenced by filing a complaint with the clerk of the court."). According to Vinings Bank's brief, "a party does not institute a suit by filing a counterclaim."

---

[10] As noted above, the Vinings Deed of Trust was also security for the performance of any "covenants and agreements" under the Vinings Deed of Trust. But Vinings Bank did not contend any covenants and agreements under the Vinings Deed of Trust had been unfulfilled.

16

We have not had occasion to interpret the attorney's fees and expenses provision of Tennessee Code Annotated § 66-25-102. The statute is penal, rather than remedial, in nature. *Kitts v. Kitts*, 189 S.W. 375, 376 (Tenn. 1916). So the statute "should be strictly construed." *Id.* *But see* SCALIA & GARNER, *supra*, at 356 ("Strict constructionism, as opposed to fair-reading textualism, is not a doctrine to be taken seriously.").

Considering the context in which the phrase "the party instituting suit" is used and the general purpose of Tennessee Code Annotated § 66-25-102, we conclude that the phrase "the party instituting suit" includes a party asserting a counterclaim. The reported federal cases cited by Vinings Bank might lead one to the opposite conclusion. But ultimately, the federal cases are distinguishable in that they involve interpretation of, admittedly similiar, language in the context of a different statute with a different purpose.[11] From a textual standpoint, the word "suit" refers to "[a]ny proceeding by a party or parties against another in a court of law." *Suit*, BLACK'S LAW DICTIONARY (10th ed. 2014). In that sense of the word, a counterclaim can be referred to as a "countersuit." *See, e.g.*, *Advanced Photographic Sols., LLC v. Nat'l Studios, Inc.*, 352 S.W.3d 431, 439 (Tenn. Ct. App. 2011) (quoting testimony of a threatened countersuit); *Henry Cty. Med. Ctr. v. Gronski*, No. 02A01-9412-CV-00279, 1996 WL 507504, at *5 (Tenn. Ct. App. Sept. 9, 1996) (stating the defendant "prevailed on his countersuit"); *Deposit Recovery Corp. v. Santini*, 765 S.W.2d 764, 769 (Tenn. Ct. App. 1988) (describing counterclaims as the "countersuit"); *Wachovia Bank & Tr. Co., N. A. v. Glass*, 575 S.W.2d 950, 952 (Tenn. Ct. App. 1978) (referring to a "cross complaint" as a "countersuit"); *Grinnell Fire Prot. Sys. Co. v. W. C. Ealy & Assocs., Inc.*, 552 S.W.2d 747, 749 (Tenn. Ct. App. 1977) (referring to the countersuit of defendant for damages); *see also Counterclaim*, BLACK'S LAW DICTIONARY (10th ed. 2014). So filing or asserting a counterclaim might be described as instituting a suit or a countersuit.

But the purpose of the statute is the more compelling argument for interpreting the phrase "the party instituting suit" as including a party asserting a counterclaim. In addition to providing a mechanism for obtaining a release of a deed of trust, the purpose of the statute is to penalize "the holder of any debt secured by real property" who "fails to enter a proper release of record after having been fully paid." Tenn. Code Ann. § 66-25-102(a). Given that purpose, we see no basis for distinguishing between claims asserted in complaints and claims asserted in counterclaims. Under Vinings Bank's interpretation, a mortgagee that wrongfully refused a request to release its deed of trust could escape liability for attorney's fees and expenses by racing to the courthouse to file suit first. *See* Tenn. R. Civ. P. 13.01 (designating some counterclaims as compulsory).

---

[11] *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 77 & 86 (2d Cir. 2003); *Int'l Bhd. of Elec. Workers, Local 336 v. Illinois Bell Tel. Co.*, 496 F.2d 1, 2 & 3 (7th Cir. 1974).

Under Tennessee Code Annotated § 66-25-102(c), if a counterclaim is filed to collect the forfeitures for failure to enter a proper release of record, the counterclaimant may seek recovery of reasonable attorney's fees, expenses, and costs. We grant Homeland's request for attorney's fees, expenses, and costs incurred on appeal.

**IV.**

We conclude that the Owner's Consent to Pledge of Collateral signed by Mark Cantrell was not unconscionable and satisfied Georgia's statute of frauds. On the undisputed facts, we also conclude that neither waiver nor equitable estoppel prohibited enforcement of the Owner's Consent. But Georgia's "Open-End" Clauses Statute limited the dragnet clause in the Owner's Consent to debts of Mark Cantrell to Vinings Bank. The trial court properly concluded that the Owner's Consent was "null and void" as to Homeland Community Bank because it lacked actual notice of the agreement. And Homeland Community Bank was entitled to recovery of its attorney's fees, expenses, and costs. Thus, we affirm the judgment of the trial court as modified. We remand this case to the trial court for a determination of a reasonable amount of attorney's fees, expenses, and costs to be awarded to Homeland Community Bank and for such further proceedings as may be necessary and consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE